UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TIMOTHY S. FLYNN, ELIZABETH | § | |
| FLYNN, TIMOTHY S. FLYNN as | § | CIVIL ACTION NO. 1:25-cv-00077 |
| parent of M.F., a minor, and | § | |
| TIMOTHY S. FLYNN as parent of | § | |
| C.F., a minor | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| VS. | § | |
| | § | |
| ISLAMIC REPUBLIC OF IRAN | § | |
| | § | |
| **Defendant** | § | |

<u>**ORIGINAL COMPLAINT**</u>

**TO THE HONORABLE COURT:**

**COME NOW**, Timothy S. Flynn, Elizabeth Flynn, Timothy S. Flynn as parent of M.F., a minor, and Timothy S. Flynn as parent of C.F., a minor (herein referred to as "Plaintiffs"), and file this Complaint for multiple causes of action against Defendant the Islamic Republic of Iran (hereinafter referred to as "Defendant"). Plaintiffs would show this Court as follows:

**I. INTRODUCTION**

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, the Antiterrorism Act, 18 U.S.C. § 2333, and supplemental causes of action, seeking damages for personal injury and related torts, arising from multiple terrorist attacks and improvised explosive device (IED) explosions experienced by Plaintiff Timothy S. Flynn, from July 2005 to April 2006, in areas of Iraq, including Ramadi, Iraq, in which the Plaintiff was severely injured (the "Terrorist Attacks"). These

attacks were planned by al Qaeda terrorists with material support, weapons, training, and funding from Defendant Islamic Republic of Iran.

## II. PARTIES

2.      Plaintiff Timothy S. Flynn is currently a Pennsylvania resident and was an active-duty Army soldier at the time of the allegations giving rise to this cause of action. Plaintiff was deployed as a sniper and assistant leader of a long-range surveillance (LRS) team from the U.S. Army 104th Infantry Division, assigned to various areas of Iraq to provide security and intelligence collection in support of the Iraqi Provisional Authority (IPA), and to conduct surveillance, apprehension and deterrence of terrorist suspects.

During his deployment and service as an Army sergeant and assistant LRS team leader in Iraq from July 2005 to June 2006, Plaintiff was severely injured when he and his team were hit with multiple improvised explosive device (IED) blasts as they were conducting peacekeeping operations in support of the IPA. These IEDs were built in Iran and designed to maim, kill, murder, and destroy U.S. military personnel in their armored vehicles.

3.      Plaintiff Elizabeth Flynn is the wife of Plaintiff Timothy S. Flynn.

4.      Plaintiff Timothy S. Flynn is the parent of M.F., a minor.

5.      Plaintiff Timothy S. Flynn is the parent of C.F., a minor.

6.      Defendant the Islamic Republic of Iran is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603 and designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran provided material support and resources for the commission of acts of extrajudicial killing and overseas attacks on Americans, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks, authorized and ratified the actions of

its officials, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attacks and the harm to the Plaintiffs.

### III. JURISDICITION AND VENUE

7.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331 and 1605A, and 18 U.S.C. §§ 2333 and 2338.

8.    This Court has personal jurisdiction over defendant Iran pursuant to 28 U.S.C. § 1330(b).

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(3) and the rules of pendent venue.

10.    Defendant also availed itself to the jurisdiction of a Texas Federal Court when in 2020, it was discovered that the Islamic Republic of Iran conspired with four Texas residents (situated in Texas) to bypass the official oil embargo on Iran and sell Iranian oil to China via the use of shell companies. The Texas residents were indicted in 2020 on charges of conspiracy and violating the International Emergency Economic Powers Act related to the economic sanctions against Iran.

The Texas residents were identified as: Daniel Ray Lane, 38; Robert Thwaites, 30; Nicholas James Fuchs, 26; and Zhenyu Wang, 39. The criminal complaint, *USA v. Hovan,* et al., 2:20-CR-254, Eastern District Pennsylvania, is attached as **Exhibit 1**.

### IV. EXHAUSTION OF ADMINISTRATIVE PROCEDURES

11.    All other conditions precedent have been performed or have occurred.

### V. JURY DEMAND

12.    Plaintiffs demand a jury trial on all issues so triable.

## VI. STATUTE OF LIMITATIONS TOLLED

13.    Any applicable statute of limitations is tolled by the Defendant's omissions and fraudulent concealment. Texas recognizes the *fraudulent concealment doctrine* and requires that a plaintiff plead, and subsequently prove, that (1) defendant had actual knowledge of the facts giving rise to plaintiff's cause of action, (2) defendant concealed its unlawful conduct, and (3) plaintiff failed, despite due diligence on his part, to discover the facts giving rise to his cause of action. *See Tex. v. Allen Constr. Co.,* 851 F.2d 1526, 1528 (5th Cir. 1988); *see also Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (5th Cir. 1984).

Thus, when a defendant controls the facts giving rise to a plaintiff's cause of action "such that a reasonable person could not obtain the information even with a diligent investigation, a cause of action accrues, but the statute of limitations is tolled." *Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir. 1995). To adequately plead allegations of *fraudulent concealment,* a plaintiff must plead sufficient facts to place the defendants on notice of the tolling theory on which the plaintiff's complaint rests. *Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc.,* 1 F.3d 374, 376 (5th Cir. 1993); *Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1425 (5th Cir. 1992).

14.    In the instant case, it was only recently discovered in 2020 that: a) Defendant was harboring al Qaeda leaders and fugitives in Iran (*see* Section VII, Item 38); and b) Defendant conspired with four Texas residents in 2020 to violate the embargo and sell Defendant's oil to China. *See Section II,* Items 7-8, supra.

## VII. STATEMENT OF THE CASE

15.    Since the 1979 Iranian Revolution, Iran has been ruled by a series of governments and dictators deeply hostile to the United States.

16.      From 1984 until the present time, Iran has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

17.      During all periods relevant to this suit, it has been the continuous and official policy of Iran to use terrorism against the United States and its allies, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, Iran is able to enlist these terrorist proxies to carry out attacks against the United States, and advance Iranian interests around the world. Iran exploits its support for terrorist organizations to obtain leverage with other countries, either "punishing" them or obtaining concessions from them.

18.      Additionally, Iran utilizes its support of international terrorism to attempt to: (a) intimidate and influence the United States government and public, and thereby to weaken, harm and undermine the United States militarily, economically and politically; and (b) intimidate and influence the Iraqi government and public and thereby seeks to bring about the eventual eradication of the secular Republic of Iraq and replace it with an Islamic state; and (c) the murder and/or expulsion of U.S. servicemembers and U.S. government employees from the Middle East.

19.      Towards these ends, Iran has provided massive material support and resources to numerous anti-American and anti-Iraq terrorist organizations, including al Qaeda, which shares Iran's violently anti-American ideology and goals.

### Iran's Support of al Qaeda in Iraq

20.      During the period relevant hereto, Iran provided al Qaeda with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described in detail below, with the specific intention of causing and facilitating the commission of acts of

extrajudicial killing and attacks on Americans, including the Terrorist Attacks. Such

support was provided continuously, routinely and in furtherance and as implementation

of a specific policy and practice established and maintained by Iran, in order to assist al

Qaeda in achieving goals shared by Iran. These goals included terrorizing the American

servicemembers in Iraq, destabilizing the Republic of Iraq, attacking the civilian

population in Iraq, weakening Iraq's economy, social fabric, and military strength and

preparedness, and harming Iraq's allies and supporters, especially the United States.

21.    Iran provided the material support and resources detailed below pursuant

to an agreement reached between Iran and al Qaeda in the years prior to the Terrorist

Attacks. Under that agreement, al Qaeda undertook to carry out acts of extrajudicial

killing and terrorism against U.S. servicemembers in Iraq and elsewhere, and in return

Iran undertook to provide al Qaeda with material support and resources to carry out such

extrajudicial killings and terrorist attacks. The purpose of this agreement between Iran

and al Qaeda was to achieve the goals detailed in the preceding paragraph and replace the

government of Iraq with an Islamic dictatorship.

22.    Iran provided the material support and resources detailed below through

its security and intelligence agencies. These security and intelligence agencies included

primarily, but without limitation, Iran's Ministry of Intelligence and Security ("MOIS"),

the Islamic Revolutionary Guard Corps ("IRGC"), and a subdivision of the IRGC known

as the Islamic Revolutionary Guard Corps-Quds Force ("IRGC-QF").

23.    Iran provided al Qaeda with the material support and resources detailed

below through officials, employees, and agents of Iran who worked in or with MOIS, the

IRGC and the IRGC-QF. These Iranian officials, employees, and agents included without

limitation: Ali Fallahian, Saeed Emami, Mohsen Rezaee, and Ahmad Vahidi (collectively below: "Iranian Officials").

24.     In addition, at all times relevant hereto, Iran and the Iranian Officials provided al Qaeda with the material support and resources detailed below, by and through the agency of Iranian-supported terrorist groups and terrorist operatives (collectively below: "Iranian Agents"), which and who received material support and resources from Iran and Iranian Officials for the purpose of providing material support and resources to al Qaeda, and which acted as agents and proxies of Iran and Iranian Officials for that purpose. The Iranian Officials and the Iranian Agents are collectively referred to below as Iran's "Officials and Agents."

25.     The material support and resources that were provided to al Qaeda by Iran and its Officials and Agents in the years immediately prior to the Terrorist Attacks for the purpose of facilitating acts of extrajudicial killing and terrorism included inter alia: provision of financial support to al Qaeda; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to al Qaeda; provision of military-grade explosives, military firearms and other weapons and matériel to al Qaeda; providing use of training bases and military facilities in which terrorist training was provided to al Qaeda and its operatives; providing al Qaeda and its leaders and operatives safe haven and refuge from capture; providing al Qaeda means of electronic communication; providing al Qaeda with financial services, including banking and wire transfer services; and providing al Qaeda means of transportation, including allowing leaders and operatives of al Qaeda passage on Iranian-owned aircraft to allow them to avoid detection and carry out further terrorist attacks.

26.     Iran and its Officials and Agents gave substantial aid and assistance to al

Qaeda, and provided the massive material support and resources described above to al Qaeda, and thereby aided and abetted al Qaeda, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and terrorism, including the Terrorist Attacks. Iran and its Officials and Agents did so with actual knowledge that al Qaeda had killed and injured U.S. citizens in terrorist attacks and that additional U.S. citizens and other persons would be killed and injured as a result of their aiding, abetting, and provisioning of material support and resources to al Qaeda.

27.     Iran and its Officials and Agents knowingly and willingly conspired, agreed and acted in concert with al Qaeda, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, including the Terrorist Attacks. Iran and its Officials and Agents did so with actual knowledge that al Qaeda had killed and injured U.S. citizens and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with al Qaeda.

28.     At all times relevant hereto, MOIS, IRGC and the IRGC-QF were agencies, instrumentalities and/or offices of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran and within the scope of their agency and office, within the meaning of 28 U.S.C. § 1605A(a)(1) and 1605A(c), which caused the Terrorist Attacks and harm to the plaintiffs herein, in that MOIS, IRGC and the IRGC-QF implemented and acted as conduits and instrumentalities for Iran's provision of funds, terrorist training, and other material support and resources to al Qaeda for the commission of acts of attempted extrajudicial killing and terrorism including the Terrorist Attacks.

29.     Iran authorized, ratified and approved the actions of MOIS, IRGC and the IRGC-QF described herein, and is therefore vicariously liable for those actions.

30.     At all relevant times, Iran's Officials and Agents were officials, employees, and/or agents of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. § 1605A(a)(1) and 1605A(c), which caused the Terrorist Attacks and harm to the plaintiffs herein, in that Iran's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Iran to al Qaeda for the commission of acts of attempted extrajudicial killing and acts of terror, including the Terrorist Attacks.

31.     Iran authorized, ratified and approved the actions described herein of its Officials and Agents, and is therefore vicariously liable for those actions.

**Iran's Support for and Harboring of al Qaeda Terrorists**

32.     After the launch of Operation Enduring Freedom in October 2001 in response to the September 11 attacks, many members of al Qaeda, including Osama bin Laden, fled to the lawless Federally Administered Tribal Areas of Western Pakistan. Key elements of al Qaeda leadership also escaped to Iran, with Iranian authorities' assistance. In late 2001, for example, a senior al Qaeda operative based in Iran, Mustafa Hamid, negotiated with the Iranian government to relocate al Qaeda families to Iran.

33.     Under such arrangements, key members of al Qaeda's operational structure came to reside in Iran, including such infamous figures as Saif al-Adel (Security Chief), Saad bin Laden (Osama's son, Senior Operative), Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri, CFO of al Qaeda) and Abu Musab al-Zarqawi (future

9

Chief of al Qaeda in Iraq). *See "Alliance Against America: Al Qaeda and Iran."* United Against Nuclear Iran, https://www.unitedagainstnucleariran.com/node/3295

34.     Notionally, Iran held these al Qaeda operatives under "house arrest," but in reality, al Qaeda was using Iran as a base of operations under the protection of the Quds Force. By providing al Qaeda operatives such sanctuary, Iran was in direct violation of U.N. Security Council Resolution 1390, which prohibited the harboring of al Qaeda members. *Id.*

35.     In 2003, The Washington Post reported on a "decade-old relationship" between Ayman Zawahiri, then al Qaeda's second-in-command, and Ahmad Vahidi, Iran's former Minister of Defense. In 2001, Vahidi reportedly provided "safe harbor for some of al Qaeda's leaders who were trapped in the mountains of Tora Bora, Afghanistan," following negotiations with Zawahiri. According to a European intelligence analyst, "The [Iranian Quds] Force's senior leaders have long-standing ties to al Qaeda, and, since the fall of Afghanistan, have provided some al Qaeda leaders with travel documents and safe haven." *See* Priest, Dana & Farah, Douglas. *"Iranian Force Has Long Ties to Al Qaeda."* The Washington Post, Oct. 13, 2003, https://www.washingtonpost.com/archive/politics/2003/10/14/iranian-force-has-long-ties-to-al-qaeda/35ad4db7-3ff8-47a5-9673-4e1b5788b3b3/

36.     In January 2009, the U.S. Treasury Department froze the assets of four key al Qaeda operatives based in Iran, including Osama bin Laden's eldest son, Saad bin Laden. Regarding this action, former Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, stated, "It is important that Iran give a public accounting of how it is meeting its international obligations to constrain al Qaida." *See "Treasury*

*Targets Al Qaida Operatives in Iran."* U.S. Department of the Treasury, January 16, 2009, https://home.treasury.gov/news/press-releases/hp1360

37.    In its 2010 Country Reports on Terrorism, the U.S. State Department noted that "Iran has repeatedly resisted numerous calls to transfer custody of its AQ [al Qaeda] detainees to their countries of origin or third countries for trial." *See "Country Reports on Terrorism 2010."* United States Department of State, August 2011, 150-151 https://2009-2017.state.gov/documents/organization/170479.pdf

38.    In November 2020, Iran's ongoing harboring of al Qaeda operatives was exposed when The New York Times revealed that Abdullah Ahmed Abdullah, alias Abu Muhammad al-Masri, was gunned down in Tehran on August 7, 2020, along with his daughter, the widow of Hamza Bin Laden. Iran initially sought to obfuscate the identity of the slain al Qaeda operative, reportedly al Qaeda's second in command at the time, with official media sources claiming the victims were a Lebanese history professor affiliated with Hezbollah and his daughter. *See* Golman, Adam, et al. *"Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran."* The New York Times, Nov. 13, 2020, https://www.nytimes.com/2020/11/13/world/middleeast/al-masri-abdullah-qaeda-dead.html

39.    Al-Masri ordered the al Qaeda bombings of U.S. embassies in Kenya and Tanzania on August 7, 1998. He was targeted for killing by two gunmen on a motorbike on the 22nd anniversary of those attacks. According to a senior U.S. official, Israeli agents acting at the behest of the U.S. carried out the assassination. Although initially under house arrest, al-Masri had reportedly been living freely in an upscale Tehran suburb since 2015. Israeli media cited intelligence sources that Iran provided a permissive environment from which al-Masri planned operations against Israeli and

Jewish targets around the world. *Id.*

40.    From its Iranian safe haven, al Qaeda members have planned terrorist operations that have killed dozens of people, including Americans. For example, on May 12, 2003, al Qaeda commandos attacked residential compounds housing foreign workers in Riyadh, Saudi Arabia, killing 35 people, including eight Americans. The attacks were reportedly planned and ordered by al Qaeda operatives in Iran, specifically Saif al-Adel and Sa'ad bin Laden. Through the U.N., the U.S. conveyed "our deep, deep concern that individuals associated with al Qaeda have planned and directed the attack in Saudi Arabia from inside Iran." *See* Jehl, Douglas & Schmitt, Eric. *"AFTEREFFECTS: HAVENS; U.S. Suggests a Qaeda Cell in Iran Directed Saudi Bombings."* The New York Times, May 21, 2003, https://www.nytimes.com/2003/05/21/world/aftereffects-havens-us-suggests-a-qaeda-cell-in-iran-directed-saudi-bombings.html

41.    An intercepted letter reportedly sent to the IRGC in 2008 by Ayman al-Zawahiri, who was killed by a U.S. drone strike in 2022, revealed an even deeper relationship between Iran and al Qaeda than previously thought. The correspondence was sent after the September 19, 2008 attacks on the American embassy in Sana'a, Yemen, which killed 19 people. The Telegraph reported, "In the letter, al Qaeda's leadership pays tribute to Iran's generosity, stating that without its 'monetary and infrastructure assistance' it would not have been possible for the group to carry out the terror attacks. It also thanked Iran for having the 'vision' to help the terror organization establish new bases in Yemen after al-Qaeda was forced to abandon much of its terrorist infrastructure in Iraq and Saudi Arabia." *See* Coughlin, Con. *"Iran Receives al Qaeda Praise for Role in Terrorist Attacks."* The Telegraph, Nov. 23, 2008, https://www.telegraph.co.uk/news/worldnews/middleeast/iran/3506544/Iran-receives-al-

Qaeda-praise-for-role-in-terrorist-attacks.html

42.     Following the U.S. invasion of Afghanistan, Iran also provided safe haven to al Qaeda operative Abu Musab al-Zarqawi, who went on to establish al Qaeda in Iraq, an al Qaeda offshoot that went on to kill and maim untold numbers of Iraqis and Americans. Zarqawi initially operated under the protection of the IRGC and its elite Quds Brigade. According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network and contacts in Afghanistan, before relocating to Iraq. While the Iranian regime eventually succumbed to U.S. pressure, forcing Zarqawi to leave Iran and arresting many of his personnel, the damage had already been done. Zarqawi's network was already rebuilt, even though the Iranian authorities could have prevented such an outcome at any time.

## VIII. ABU MUSAB AL-ZARQAWI AND THE TERRORIST ATTACKS

43.     Al-Zarqawi was a Jordanian jihadist who ran a terrorist training camp in Afghanistan. He became known after going to Iraq in 2002 and organizing a series of bombings, beheadings, and attacks during the Iraq War, turning an insurgency against U.S. troops in Iraq into a Shia-Sunni civil war. He was also known as "Sheikh of the Slaughterers." *See* Michael Weiss & Hassan Hassan, *"Sheikh of the Slaughterers,"* ISIS: Inside the Army of Terror (2015).

44.     Al-Zarqawi formed al-Tawhid wal-Jihad in the 1990s, and led it until his death in June 2006. Zarqawi took responsibility, on several audio and video recordings, for numerous acts of violence in Iraq, including suicide bombings, hostage executions, and the shootdown of a Marine Cobra helicopter in Ramadi, near Habbaniya. Zarqawi opposed the presence of U.S. and Western military forces in the Islamic world, as well as the West's support for the existence of Israel.

13

45.    In late 2004, Zarqawi joined al Qaeda, and pledged allegiance to Osama bin Laden. After this, al-Tawhid wal-Jihad became known as Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn, also known as al Qaeda in Iraq (AQI), and Zarqawi was given the al Qaeda title "Emir of al Qaeda in the Country of Two Rivers." *See* Zaki Chehab, *Iraq Ablaze: Inside the Insurgency,* 8 (2006).

46.    From 2003 to 2006, Zarqawi dispatched numerous suicide bombers and IED bombs throughout Iraq to attack American soldiers and areas with large concentrations of Shia militias. In September 2005, Zarqawi declared "all-out war" on Shi'ites in Iraq, after the Iraqi government offensive on insurgents in the Sunni town of Tal Afar. He was also responsible for the 2005 bombing of three hotels in Amman, Jordan. *See* Whitlock, Craig. *"Amman Bombings Reflect Zarqawi's Growing Reach."* The Washington Post, Nov. 12, 2005.

47.    Zarqawi was killed in a targeted strike by a joint U.S. force on June 7, 2006, while attending a meeting in an isolated safehouse in Hibhib, a small village approximately five miles west-northwest of Baqubah. Years before his death, Zarqawi began to obtain funds from Defendant and through Defendant's ties to al Qaeda, in order to purchase advanced weaponry and smuggle IED bombs and anti-tank shaped charges, capable of destroying U.S. tanks, vehicles, and armored personnel carriers in Afghanistan and Iraq.

48.    Through funding provided by Defendant, Zarqawi had access to large bank accounts and the capability to buy and smuggle from Iran into Iraq custom-made IEDs and shaped-charge munitions that were not used by the old or new Iraqi army or Iraqi security forces. Due to previous U.S. operations that destroyed arms caches, al Qaeda needed to obtain newer munitions from Iran and have them smuggled into Iraq.

The IEDs used in the attacks on the Plaintiff were purchased using funds provided by the Defendant and then smuggled from Iran into Iraq.

49.    In *Karcher v. Islamic Republic of Iran*, the U.S. District Court for the District of Columbia found that Iran was liable for nearly all IED (improvised explosive device) and EFP (explosively formed penetrator) attacks on U.S. servicemembers in Iraq. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019). The *Karcher* court held a series of bellwether hearings on the topic of Iran's liability for IED attacks. Multiple experts testified that IED and EFP attacks could not have been conducted without the support of the IRGC and Quds Force. The expert report of Russell L. McIntyre concluded "that American policy-makers greatly miscalculated in their assessment of Iran's objectives and capabilities in Iraq and vastly underestimated Iran's role in targeting American service members with a wide variety of surrogates and weapons…hundreds of American soldiers and civilians were murdered, and thousands wounded, in Iraq at the direction of the IRGC-QF…." (*Id.*)

50.    Acting through the IRGC and Quds Force, Iran provided material support and resources to al Qaeda for the IED attacks that resulted in Plaintiff Timothy S. Flynn's injuries.

51.    Flynn consistently engaged al Qaeda cells known to be under the direction of Abu Musab al-Zarqawi. In the fall of 2005, Flynn's LRS team captured a terrorist cell in Ramadi. During the search, the team found numerous items linking the cell directly to al-Zarqawi, including a "welcome letter to al Qaeda" and a video of insurgents attacking U.S. infantrymen's vehicles with IEDs. During a reconnaissance mission in Ramadi on April 14, 2006, Sergeant Flynn identified an al Qaeda leader whose capture provided intelligence which led to the air strike that killed al-Zarqawi less than two months later.

15

52.      Flynn's LRS team often rode with a supporting infantry unit in Humvees or Bradley Fighting Vehicles, and then dismounted and performed operations on foot. On or about July 22, 2005, Plaintiff was injured when the Bradley Fighting Vehicle he was riding in was hit by a roadside IED. The blast blew the wheels off the Bradley, disabling Plaintiff's vehicle. Plaintiff suffered ringing in his ears as a result of the blast.

53.      On November 20, 2005, while on foot patrol in Ramadi, Iraq, Plaintiff was severely injured by an IED blast when he and his team were ambushed by insurgents. Plaintiff was hit with shrapnel on the side of his face and neck, and was knocked unconscious by the blast wave. Plaintiff suffered a concussion and traumatic brain injury (TBI), lost his hearing for one week after the blast, and was taken off duty for two weeks. Sergeant Flynn was awarded the Purple Heart as a result of the November 20, 2005 attack.[1]

54.      Plaintiff was the victim of a third terrorist attack on March 7, 2006, when the M1114 up-armored Humvee he was riding in was hit by a roadside IED. The explosion disabled Plaintiff's Humvee. Plaintiff was knocked unconscious by the blast wave and suffered a traumatic brain injury and further hearing loss as a result of this attack.

55.      Plaintiff was the victim of a fourth terrorist attack on April 6, 2006, when the Humvee he was riding in was hit by a vehicle-borne IED driven by a suicide bomber. Each terrorist attack occurred in Ramadi, was carried out by insurgents, and was intended to kill the Plaintiff.

---

[1] Dennis Amrhein, who holds a final judgment issued by this Court, was attached to Flynn's team on this patrol. Amrhein was injured in the same November 20, 2005 IED attack that caused Flynn's injuries. See *Amrhein v. Islamic Republic of Iran,* 1:22-cv-76, USDC, Southern District of Texas.

56.    Plaintiff was severely injured by the blast waves and suffered concussive trauma from these IED attacks. Plaintiff was knocked unconscious by the force of the IED blasts. Plaintiff suffered multiple concussions, multiple traumatic brain injuries, hearing damage, and injuries to his face, neck, ankle and knee. Plaintiff required surgery to repair a torn meniscus.

57.    Plaintiff suffered multiple traumatic brain injuries, PTSD, tinnitus and other injuries from these attacks.

58.    At the time, Iran was providing funding, weapons, and support to al Qaeda, who was operating in Iraq to kill U.S. forces and destabilize the provisional government.

59.    Without Defendant's support, financing, and supervision of al Qaeda, Plaintiff Timothy S. Flynn would not have been attacked and maimed during the American stabilization operations in Iraq in 2005 and 2006.

60.    Plaintiff suffered permanent physical and psychological injuries from these Terrorist Attacks and IED blasts, including traumatic brain injury (TBI), chronic post-traumatic stress disorder (PTSD), recurrent and severe major depressive disorder, obsessive compulsive disorder, agoraphobia, headaches, constant tinnitus, difficulty concentrating, hearing loss, memory loss and other injuries.

61.    Defendant Islamic Republic of Iran has a long history of providing funding, intelligence, logistics, support, and transportation to al Qaeda. Defendant's actions and omissions were the proximate cause of the injuries suffered by Plaintiff Timothy S. Flynn, and damages incurred by Plaintiff Timothy S. Flynn, Elizabeth Flynn, M.F., the daughter of Timothy S. Flynn, and C.F., the son of Timothy S. Flynn.

### IX. CAUSES OF ACTION

**A.    Plaintiff Timothy S. Flynn's Cause of Action for the Personal Injury Against Iran and for Damages Under 28 USC § 1605A(c)**

62.    Plaintiff Timothy S. Flynn repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff is the victim of Terrorist Attacks funded and supervised by Defendant Islamic Republic of Iran.

63.    Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

64.    Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attacks upon Plaintiff Timothy S. Flynn.

65.    Iran conspired with al Qaeda to carry out the Terrorist Attacks to destabilize Iraq and injure U.S. servicemembers, including Plaintiff Timothy S. Flynn.

66.    MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks, and conspired with al Qaeda to carry out the Terrorist Attacks, all within the scope of their agency and office.

67.    Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks, and conspired with al Qaeda to carry out the Terrorist Attacks, all while acting within the scope of their office, employment, and agency.

68.    Al Qaeda is an agent of Iran, and it carried out the Terrorist Attacks while acting within the scope of its agency.

69.    The Terrorist Attacks were an attempted extrajudicial murder and

provision of material support and resources to al Qaeda within the meaning of 28 U.S.C.
§ 1605A.

70.    The Terrorist Attacks caused the Plaintiff Timothy S. Flynn severe injury,
including pain and suffering (past, present, and future); economic damages (past, present,
and future) and loss of income (past, present, and future); and severe emotional distress
and mental anguish.

71.    The Terrorist Attacks and the harm and injuries suffered by Plaintiff
Timothy S. Flynn were the direct and proximate result of Iran's conduct described herein.

72.    Iran is therefore liable for the full amount of Plaintiff Timothy S. Flynn's
damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

73.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a
threat to the public, warranting an award of punitive damages under 28 U.S.C. §
1605A(c).

**B**.    **Plaintiff Elizabeth Flynn's Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

74.    Plaintiff Elizabeth Flynn repeats and repleads all of the preceding
paragraphs as if fully set forth herein. Plaintiff Elizabeth Flynn is the wife of Plaintiff
Timothy S. Flynn. Timothy S. Flynn was the victim of Terrorist Attacks funded and
supervised by Defendant Islamic Republic of Iran.

75.    Iran is a foreign state that since 1984 has continuously been designated as
a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

76.    Iran provided material support and resources to al Qaeda, within the
meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attacks upon
her husband, Plaintiff Timothy S. Flynn.

77.    Iran conspired with al Qaeda to carry out the Terrorist Attacks to destabilize Iraq and injure U.S. servicemembers, including Plaintiff's husband, Timothy S. Flynn.

78.    MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks on Timothy S. Flynn, and conspired with al Qaeda to carry out the Terrorist Attacks, all within the scope of their agency and office.

79.    Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks on Timothy S. Flynn, and conspired with al Qaeda to carry out the Terrorist Attacks, all while acting within the scope of their office, employment, and agency.

80.    Al Qaeda is an agent of Iran, and it carried out the Terrorist Attacks while acting within the scope of its agency.

81.    The Terrorist Attacks on Timothy S. Flynn were an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

82.    The Terrorist Attacks caused Plaintiff Elizabeth Flynn's injuries, including loss of guidance; loss of companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

83.    The Terrorist Attacks and the harm and injuries suffered by Plaintiff Elizabeth Flynn were the direct and proximate result of Iran's conduct described herein.

84.    Iran is therefore liable for the full amount of Elizabeth Flynn's damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

85.     Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**C.     Plaintiff Timothy S. Flynn, as Parent of M.F., a minor's Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

86.     Plaintiff Timothy S. Flynn, as Parent of M.F., repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff M.F. is the natural daughter of Plaintiff Timothy S. Flynn. Timothy S. Flynn was the victim of Terrorist Attacks funded and supervised by Defendant Islamic Republic of Iran.

87.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

88.     Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attacks upon Plaintiff's father, Timothy S. Flynn.

89.     Iran conspired with al Qaeda to carry out the Terrorist Attacks to destabilize Iraq and injure U.S. servicemembers, including Plaintiff's father, Timothy S. Flynn.

90.     MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks on Timothy S. Flynn, and conspired with al Qaeda to carry out the Terrorist Attacks, all within the scope of their agency and office.

91.     Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks on Timothy S. Flynn, and conspired with al Qaeda to carry out the

Terrorist Attacks, all while acting within the scope of their office, employment, and agency.

92.     Al Qaeda is an agent of Iran, and it carried out the Terrorist Attacks while acting within the scope of its agency.

93.     The Terrorist Attacks on Plaintiff M.F.'s father were an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

94.     The Terrorist Attacks caused Plaintiff M.F.'s injuries, including loss of guidance; loss of companionship and society; severe emotional distress and mental anguish; and loss of solatium.

95.     The Terrorist Attacks and the harm and injuries suffered by Plaintiff M.F. were the direct and proximate result of Iran's conduct described herein.

96.     Iran is therefore liable for the full amount of Plaintiff M.F.'s damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

97.     Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**D.     Plaintiff Timothy S. Flynn, as Parent of C.F., a minor's Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

98.     Plaintiff Timothy S. Flynn, as Parent of C.F., repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff C.F. is the natural son of Plaintiff Timothy S. Flynn. Timothy S. Flynn was the victim of Terrorist Attacks funded and supervised by Defendant Islamic Republic of Iran.

99.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

100.     Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attacks upon Plaintiff's father, Timothy S. Flynn.

101.     Iran conspired with al Qaeda to carry out the Terrorist Attacks to destabilize Iraq and injure U.S. servicemembers, including Plaintiff's father, Timothy S. Flynn.

102.     MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks on Timothy S. Flynn, and conspired with al Qaeda to carry out the Terrorist Attacks, all within the scope of their agency and office.

103.     Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attacks on Timothy S. Flynn, and conspired with al Qaeda to carry out the Terrorist Attacks, all while acting within the scope of their office, employment, and agency.

104.     Al Qaeda is an agent of Iran, and it carried out the Terrorist Attacks while acting within the scope of its agency.

105.     The Terrorist Attacks on Plaintiff C.F.'s father were an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

106.     The Terrorist Attacks caused Plaintiff C.F.'s injuries, including loss of guidance; loss of companionship and society; severe emotional distress and mental

anguish; and loss of solatium.

107.    The Terrorist Attacks and the harm and injuries suffered by Plaintiff C.F. were the direct and proximate result of Iran's conduct described herein.

108.    Iran is therefore liable for the full amount of Plaintiff C.F.'s damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

109.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## X. PRAYER

As a proximate cause of the foregoing, Plaintiffs have suffered damages and seek the following relief from the Defendant:

    a.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $10,000,000 (ten million dollars) as to Plaintiff Timothy S. Flynn;

    b.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $4,000,000 (four million dollars) as to Plaintiff Elizabeth Flynn;

    c.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $1,500,000 (one million five hundred thousand dollars) as to Plaintiff M.F.;

    d.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than

$1,500,000 (one million five hundred thousand dollars) as to Plaintiff C.F.;

e.    Such further relief as the Court finds just and equitable.

**WHEREFORE**, Plaintiffs request that upon trial of this cause, that Plaintiffs obtain a judgment as authorized by law, and any other relief that Plaintiffs may be entitled to.

DATED: APRIL 10, 2025                    Respectfully,

By:    ___*/S/   R. Bruce Tharpe*_____
       R. Bruce Tharpe

       Texas State Bar ID No. 19823800
       Colorado State Bar ID No. 54500
       Federal Bar ID 13098

       **LAW OFFICE OF
       R. BRUCE THARPE, PLLC**
       PO Box 101
       Olmito, TX 78575
       (956) 255-5111 (Tel)
       (866) 599-2596 (Fax)
       Email: rbtharpe@aol.com
       Questions@BruceTharpeLaw.com

       ATTORNEY OF RECORD FOR
       PLAINTIFFS